UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **FLORA PARKHURST,** | ) |
| **Plaintiff,** | ) |
| v. | ) No. 3:15-00610 |
| | ) Judge Sharp |
| **AMERICAN HEALTHWAYS SERVICES, LLC,** | ) |
| **Defendant.** | ) |

### MEMORANDUM

In this employment discrimination action, Plaintiff Flora Parkhurst sues her former employer, Defendant American Healthways Services, LLC, under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA"), the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq*. ("FMLA"). Now before the Court is Defendant's Motion for Summary Judgment (Docket No. 26), to which Plaintiff has responded in opposition (Docket No. 38) and Defendant has replied (Docket No. 40). For the reasons that follow, Defendant's Motion will be granted.

### I. Factual Background

In support of its Motion for Summary Judgment, Defendant submitted 69-paragraphs of facts, only 7 of which are disputed by Plaintiff in whole or in part. Those facts are as follows.

Defendant is a wellness company that contracts with employers and health insurers to provide wellness programs to their employees and insureds, respectively. The individuals enrolled in

1

Defendant's wellness programs are referred to internally as "members."

On December 2, 2002, Defendant hired Plaintiff to work as a Telephonic Nurse in its Well-Being Improvement Center ("WBIC") in Franklin, Tennessee. The WBIC is one of Defendant's call centers from which telephonic Nurses provide clinical advice to members over the telephone, particularly those who suffer from chronic diseases like heart disease or diabetes. Because they provide clinical advice to members, Telephonic Nurses are required to hold and maintain a Registered Nurse license.

A Telephonic Nurses' productivity was evaluated by Defendant using a metrics-based system that considered: (1) call attempts per hour, (2) successful calls per hour, (3) call handle time, and (4) time on dialer. The first measured how many calls a Telephonic Nurse attempted to make to members every hour; the second measured how many calls a Telephonic Nurse successfully completed with members each hour[1]; the third measured the length of time it took to complete a successful call (including entering notes after the call ended); and the fourth measured the percentage of a Telephonic Nurse's workday in which she was either making calls to members or available to receive calls from members.

On January 28, 2013, Lori Koyuncu, a 47 year old female, became Plaintiff's first level supervisor. Ms. Koyuncu also supervised 16 other Telephonic Nurses who ranged in age from 39 to 74. Eleven were within 10 years of Plaintiff's age, which is 62.[2] Three of the Telephonic Nurses still work for Defendant; three others who had satisfactory performance ratings voluntarily resigned.

---

[1] For it to be counted as successful, the Telephonic Nurse had to address a prescribed list of topics during the call.

[2] They were Debra Murdic (62), Cathy Orvis (67), Stephanie Blansett (66), Lee Carrington (67), Mary Fowler (62), Lenoir Francisco (72), Barbara Hill (74), Holly Mueller (59), Mozelle Smith (53), and Sherry Vasey (59).

2

Two of the nurses used FMLA while supervised by Ms. Koyuncu.

On November 6, 2013, Ms. Koyuncu placed Plaintiff on a Written Performance Improvement Plan ("November Written PIP") because, during the prior month, Plaintiff made 3.17 call attempts per hour and 0.51 successful calls per hour. Both figures were below the required 5.55 call attempts per hour and 1.05 successful calls per hour. The November Written PIP outlined a productivity improvement plan whereby, over the course of four weeks, Plaintiff would reach the required number of call attempts and successful calls per hour. Following receipt of the PIP, Plaintiff's productivity improved somewhat, but she never reached the minimum requirements for call attempts and successful calls per hour:

| Dates | Plaintiff's Call Attempts Per Hour | Plaintiff's Successful Calls Per Hour |
|---|---|---|
| 1/20/13 – 1/25/13 | 3.14 | 0.54 |
| 1/27/13 – 2/1/14 | 5.43 | 1.00 |
| 2/3/14 – 2/8/14 | 3.74 | 0.89 |

(Docket No. 28 at 8).

On January 17, 2014, Ms. Koyuncu placed Plaintiff on another Written PIP ("January Written PIP"). Plaintiff concedes she was placed on this PIP but claims that "Defendant's computer system was often broken and/or would collect inaccurate data," and this "led to the delay/extension of Plaintiff's PIP period." (Docket No. 39 at 6). The January Written PIP outlined a productivity improvement plan whereby, over the course of six weeks, Plaintiff's call attempts would rise to 8.0 per hour and successful calls would rise to 1.5 per hour. Following receipt of the January Written PIP, Plaintiff's productivity, however, remained largely unchanged:

3

| Dates | Plaintiff's Call Attempts Per Hour | Plaintiff's Successful Calls Per Hour |
|---|---|---|
| 1/20/13 – 1/25/13 | 3.14 | 0.54 |
| 1/27/13 – 2/1/14 | 5.43 | 1.00 |
| 2/3/14 – 2/8/14 | 3.74 | 0.89 |

(Docket No. 28 at 9).

Allegedly due to her lackluster performance, Plaintiff was placed on a Final Written PIP on February 11, 2014. This PIP provided Plaintiff with a two-week period in which to achieve the required 8.0 call attempts per hour and 1.50 successful calls per hour.[3] She was informed that a failure to meet these goals would result in the termination of employment. Plaintiff did not meet the goals:

| Dates | Plaintiff's Call Attempts Per Hour | Plaintiff's Successful Calls Per Hour |
|---|---|---|
| 2/10/13-2/15/13 | 5.27 | 0.74 |
| 2/17/13-2/22/13 | 4.55 | 1.44 |

Overall, from December 30, 2013 to February 22, 2014, Plaintiff averaged only 4.07 call attempts per hour and 0.87 successful calls per hour, well below the requirements. On February 25, 2014, Defendant terminated Plaintiff's employment purportedly for poor performance. After Plaintiff's termination, Defendant claims that her position was eliminated, her duties were absorbed by existing staff, and she was never replaced.

During the time that Plaintiff was under Ms. Koyuncu's supervision, Plaintiff suffered from

---

[3] The Court notes that these figures are higher than the ones imposed in November and the parties do not make clear as to why. In her deposition, however, Plaintiff stated that the metrics changed over time. She does not dispute that the metrics were the same for other Telephonic Nurses or claim that they had their performances evaluated based on different metrics.

an abnormal heart rhythm. In fact, in October 2013, she underwent a cardiac ablation to address the problem, which required an overnight hospital stay. Plaintiff provided Ms. Koyuncu with advanced notice of this procedure and her need to be absent from work. Plaintiff requested, and was granted, FMLA leave from October 11, 2013, until October 21, 2013

The administration of FMLA was outsourced by Defendant to Liberty Mutual, a third party. Defendant claims that whenever an employee needed to take FMLA leave, he or she was required to submit an application directly to Liberty Mutual. Liberty Mutual would then communicate directly with the employee and his or her physicians to gather necessary information and decide whether to approve or deny the request. Plaintiff disputes this, claiming that she was required to submit her FMLA applications directly to Ms. Koyuncu for her signature. She also claims that, on multiple occasions, Ms. Koyuncu did not return the paperwork, thereby precluding Plaintiff from submitting the paperwork to Liberty Mutual.

During her employment with Defendant, Plaintiff applied for FMLA leave on at least 10 occasions, four of which occurred while Ms. Koyuncu supervised her. Of those four, two were approved; once for intermittent leave, and the other for the regular FMLA for the heart procedure referenced previously. The other two were denied because Plaintiff did not submit the necessary documentation.

Mozelle Smith, a 53 year old co-worker, also took FMLA leave while supervised by Ms. Koyuncu. Ms. Smith was placed on a performance improvement plan at approximately the same time as Plaintiff, albeit for slightly different productivity concerns. After being put on a performance improvement plan, her productivity improved and she successfully completed the plan.

Plaintiff claims that sometime in or around November 2013, Ms. Koyuncu began making

5

disparaging comments about Plaintiff's age, health, and use of FMLA leave. Such statements included:

> • "Well, the reason you're not meeting your metrics is probably because you're not feeling well. It's probably—you know, maybe you need to find a job closer to home."
>
> • "At your age it's very—it's hard to keep up."
>
> • "Healthways is very—is a different company now. It's very difficult to keep up."
>
> • "Well, you need to probably think about a job closer to home. Your health is an issue. You have had a lot of health issues."
>
> • "Oh, again?" or "Okay" in response to Plaintiff's submission of paperwork related to a request for FMLA leave.
>
> • "Isn't it time for you to retire? Why don't you retire? You drive so far to work. Have you considered another job, a job that's not so fast-paced?"

(Docket No. 29-4, Plf. Depo. at 43, 125, 146 & 177).

## II. Standard of Review

The standards governing the review of motions for summary judgment are well-known. In fact, Plaintiff spends 2½ pages of her response brief setting forth those standards

Given the parties' understanding of the standards, it suffices to note that a party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 587 (1986).

### III. Analysis

All three claims brought by Plaintiff are subject to the same analytical framework. That is, she can attempt to prove her ADA, ADEA, and FMLA claims through either direct or circumstantial evidence, with the latter involving use of the McDonnell Douglas[4] burden shifting paradigm. "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." Kline v. Tennessee Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997).[5] Plaintiff has failed to establish a jury question on any of her claims under either approach.

### A. **Direct Evidence**

Plaintiff points to a number of statement Ms. Koyuncu allegedly made beginning shortly after Plaintiff was placed on her first performance improvement plan. None of those statements, if

---

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The paradigm was modified by the Supreme Court in Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248 (1981).

[5] Recently, the Seventh Circuit admonished trial courts in that circuit to "stop separating 'direct' from 'indirect' evidence" because the "direct-and-indirect framework does nothing to simplify the analysis" and actually "complicates matters by forcing parties to consider the same evidence in multiple ways." Ortiz v. Werner Enter., Inc., 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016). "Instead, all evidence belongs in a single pile and must be evaluated as a whole," which is a "conclusion is consistent with McDonnell Douglas and its successors." Id. at *5.

This Court agrees because "evidence is evidence," id. at 4, and it has been repeatedly observed (and juries are routinely charged) that the law makes no distinction between the two types of evidence. See 6th Cir. Pattern Criminal Jury Instruction § 1.06 (2014); 3 O'Malley, Grenig & Lee, FEDERAL JURY PRACTICE AND INSTRUCTIONS §101:42 (6th Ed. 2011); compare Stefanski v. W.W. Grainger, Inc., 155 F. App'x 177, 182 (6th Cir. 2005) ("The distinction between 'direct' and 'circumstantial' might puzzle philosophers, but it does not seem to bother lawyers and judges.") with Bartlik v. U.S. Dep't of Labor, 73 F.3d 100, 103 n.5 (6th Cir. 1996) ("The distinction between direct and circumstantial evidence in employment discrimination cases is not self-evident."). After all, the ultimate question in any discrimination case "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action," and it makes little sense to ask "whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." Ortiz, 2016 WL 441434, at *4.

in fact uttered by Ms. Koyuncu, constitutes direct evidence.

In the Sixth Circuit,

> [D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. [T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition.

DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir.2004) (internal citations and quotation marks omitted). For example, direct evidence was found to exist in Johnson v. University of Cincinnati, 215 F.3d 561, 577 n. 7 (2000), where a university president purportedly said "[w]e already have two black vice presidents. I can't bring in a black provost," but found not to exist in Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003), where a manager expressed "concern about the potentially detrimental effect on business of having an African–American comanager." As these examples suggest, "'only the most blatant remarks, whose intent could be nothing other than to discriminate'", Sharp v. Aker Plant Servs. Grp., Inc., 726 F.3d 789, 798 (6th Cir. 2013) (citation omitted), constitute direct evidence.

Ms. Koyuncu is alleged to have made the remarks in the context of performance reviews. Indeed remarks like "the reason you're not meeting your metrics is probably because you're not feeling well," and, "at your age. . . it's hard to keep up," is more easily seen as an assuaging and explanatory reason for Plaintiff's performance than as a proxy to terminate her because of her age or health. See, Curry v. Brown, 607 F. App'x 519 523-24 (6th Cir. 2015) (manager's statements that employee "needed to focus on her health problems [and] transfer to [another facility because] it would be less stressful," and that "she should probably focus on her health rather than worry about

8

the stress of supervising people," were not direct evidence of discrimination because they could "be inferred as conciliatory" and were meant to prompt the employee to "think about her health [since a] transfer would mean less stress at work"). Ms. Koyuncu's alleged statement, "oh again?" when receiving FMLA paperwork (depending on the voice inflection) may have also been a showing of concern and, in any event does not by itself show discriminatory animus when viewed in context. See Clark v. Walgreen Co., 424 F. App'x 467, 472 (6th Cir. 2011) (statement "because of your health, we're just going to go ahead and terminate you" was not direct evidence of FMLA retaliation" because it "appeared to address [the employee's] post-leave job performance as a function of his health" and he continued working for the company thereafter). And, comments like, "Isn't it time for you to retire?" and, "Why don't you retire?" are also not direct evidence of discrimination. See Lefevers v. GAF Fiberglass Corp., 667 F.3d 721, 724 (6th Cir. 2012) ("questions concerning an employee's retirement plans do not alone constitute direct evidence of age discrimination"); Scott v. Potter, 182 F. App'x 521, 526 (6th Cir. 2006) ("'retire' and 'age' are not synonymous," and question, "[w]hy don't you retire and make everybody happy?" was not direct evidence).

## B. Indirect Evidence

As noted, in the absence of direct evidence, a plaintiff may attempt to prove discrimination based upon the McDonnell-Douglas tripartite burden-shifting framework. "Under this framework, the plaintiff bears the initial 'not onerous' burden of establishing a prima facie case of discrimination by a preponderance of the evidence." White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008). "Once the plaintiff establishes this prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." Id.

9

"Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." Id. at 391-92.

### *1. ADA Claim*

The ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case, "a plaintiff must show that '1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.'" Whitfield v. Tennessee, 639 F.3d 253, 259 (6th Cir. 2011).[6]

For purposes of its summary judgment Motion, Defendant concedes that Plaintiff was disabled and it had reason to know of that disability, and that Plaintiff suffered an adverse employment action. It claims, however, that Plaintiff cannot show she was qualified for the position she held, or that she was replaced.

Turning to the qualified element, the Sixth Circuit in Wexler, an *en banc* decision, took the

---

[6] In response to Defendant's Motion, Plaintiff cites Macy v. Hopkins Cnty Sch. Bd. 484 F.3d 352, 364 (6th Cir. 2007) as support for a three prong test that would require her to show that she (1) was disabled; (2) otherwise qualified; and (3) discriminated against because of her disability. However, Macy actually used the five prong test referenced above. In any event, the Sixth Circuit in Whitfield recognized that, while some cases set forth a three-element test, the "proper test for establishing a *prima facie* case of employment discrimination under the ADA" contains five prongs. 638 F.3d at 259. This point was recently confirmed in Ferrari v. Ford Motor Co., 2016 WL 3443646, at *6 (6th Cir. June 23, 2016).

10

"opportunity to explicitly set forth what is required for a plaintiff to satisfy the qualification prong of the prima facie test," writing:

> At the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job. . . . The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field. Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills.

317 F.3d at 575-76 (italics in original). From this prism, Plaintiff was qualified because she was a licensed Registered Nurse and had held the Telephonic Nurse position for many years. Additionally, according to her Affidavit, Plaintiff trained and mentored other employees, and was member of an elite call team. Plaintiff has shown she was qualified for purposes of her *prima facie* case.

In so ruling, the Court recognizes that some cases say that "[t]o establish this element, a plaintiff must show that her performance met her employer's legitimate expectations at the time of her discharge." Vincent v. Brewer Co., 514 F.3d 489, 495 (6th Cir. 2007); see McClain v. NorthWest Cmty. Corr. Ctr. Judicial Corr. Bd., 440 F.3d 320, 334 (6th Cir. 2006) (same). Based on such cases, Defendant argues Plaintiff was not qualified because she was not meeting its metrics for phone calls at the time she was terminated.

"[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case," because "[t]o do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." Wexler, 317 F3d at 575; see Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000) ("when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage

11

of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff"). The Court therefore finds it unnecessary (if not improper) to effectively conflate the second element of a *prima facie* case with the second and third stages of the McDonnell-Douglas inquiry and will consider Defendant's argument about Plaintiff's performance in the context of the legitimate non-discriminatory reason/pretext analysis.

As for the fifth element, "'[a] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.'" Grosjean v. First Energy Corp., 349 F.3d 332, 336 (6th Cir. 2003) (citation omitted). Rather, "[a] person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." Id.

Defendant claims Plaintiff was not replaced following termination. This proposition is supported solely by an Affidavit from Courtney Walters, one of its Senior Human Resources Managers, in which she simply states that after Plaintiff was fired, "her duties were absorbed by existing employees, her position was eliminated, and she was never replaced." (Docket 29-3, Walters Aff. ¶ 33). In response, Plaintiff has submitted her own Affidavit in which she claims that "Defendant changed and reorganized its teams very frequently" (Docket No. 38-1, Pf. Depo. ¶ 16), a point she also made in her deposition. Given the sparse evidentiary record, the Court is not in a position to determine as a matter of law and fact that Plaintiff was not replaced and there remains a genuine issue of fact on this issue.

While Plaintiff has met the "not onerous" standard of a *prima facie* case, her ADA claim fails because Defendant has proffered a legitimate non-discriminatory reason for its decision, which

12

Plaintiff has not shown to be pretextual.

Defendant claims Plaintiff was terminated because she did not meet the metrics. Clearly, "[p]oor performance is a legitimate, nondiscriminatory reason for terminating a person's employment," Imwalle v. Reliance Med. Prod., Inc., 515 F.3d 531, 546 (6th Cir. 2008), as is the "continued failure to meet performance expectations after receiving corrective action and being placed on probation," Riley v. PNC Bank, Nat. Ass'n, 602 F. App'x 316, 320 (6th Cir. 2015).

"When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for her termination is pretextual." Blizzard v. Marion Tech. Coll., 698 F.3d 275, 285 (6th Cir. 2012). "At this stage, the plaintiff has the burden to produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her.' Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir.2009)." Id. "She can accomplish this by proving '(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her discharge], or (3) that they were *insufficient* to motivate discharge.' Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir.2012)." Id. (emphasis in original).

Here, Plaintiff asserts that her poor performance did not actually motivate Defendant's termination decision. Rather, her termination was as a result of her disability because Ms. Koyuncu allegedly made repeated references about her health, which began shortly after her Cardiac Ablation procedure.

"For a 'did not actually motivate' theory of pretext, 'the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal[.]'" Bhama v. Mercy Mem'l Hosp. Corp., 416 F. App'x 542, 551 (6th Cir. 2011)

13

(quoting Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir.1994). "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." Id. This "showing . . . 'ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff.'" Jones v. Potter, 488 F.3d 397, 407 (6th Cir. 2007) (citation omitted).

Plaintiff's evidence does not establish a genuine issue of material fact on whether Defendant's stated reasons "did not actually motivate" its decision to terminate her employment. Leaving aside that none of the comments were about Plaintiff's alleged disability, the comments about her health were made in the context of performance discussions and were raised as possible explanations for Plaintiff's undisputed and documented performance deficiencies. True, the comments allegedly began within weeks of Plaintiff's overnight hospital stay when Plaintiff was placed on her first PIP, but "a negative performance evaluation does not constitute an adverse employment action, unless the evaluation has an adverse impact on an employee's wages or salary," Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 322 (6th Cir. 2007), and being placed on a performance improvement plan is not an adverse employment action, Bacon v. Honda Am. Mfg., Inc., 192 F. App'x 337, 343 (6th Cir. 2006).

Plaintiff suffered an adverse employment action when she was terminated some five months after she took FMLA leave. This is hardly a conclusive temporal link. See Cooper v. City of N. Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986) ("mere fact" plaintiff "was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation");

14

Lukic v. Eisai Corp. of N. Am., 919 F. Supp. 2d 936, 954 (W.D. Tenn. 2013) (describing five month gap as a "tenuous temporal proximity" and hardly a "strong indicator of pretext"). This is particularly so since "[u]nlike its role in establishing a prima facie case, the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 285 (6th Cir.2012). Moreover, months passed between the time that Ms. Koyuncu is alleged to have started making disparaging statements about Plaintiff's health and age and during this period Plaintiff was thrice placed on PIPs, none of which she ever successfully completed.

"Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" Chen, 580 F.3d at 401 n.4. This inquiry

> requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. . . . [A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination. . . . At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.

Id. The Court finds that Plaintiff has not produced such evidence, and will grant summary judgment on her ADA claim.

### *2. ADEA and FMLA Claims*

Much of the foregoing has equal applicability to Plaintiff's ADEA and FMLA claims, recognizing, of course that the elements of a *prima facie* case are different. In fact, the parties raise virtually the same argument in support of, and in response to, Defendants' Motion for Summary Judgment on these claims.

To establish a *prima facie* case of age discrimination, Plaintiff must show that she "(1) was a member of a protected class of persons (i.e., persons 40 years of age or over), (2) was discharged,

15

(3) was qualified for the position held, and (4) was replaced by someone outside of the protected class." Allen v. Highlands Hosp. Corp., 545 F.3d 387, 394 (6th Cir. 2008). To establish an FMLA retaliation claim using indirect evidence, Plaintiff must show "(1) she engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity." Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007).

As with the ADA claim, Defendant asserts that Plaintiff cannot show that she was qualified or that she was replaced. For the reasons already expressed, however, the Court finds those arguments unconvincing.

Whether Plaintiff has established a *prima facie* case of FMLA retaliation presents a closer question because she must establish a causal connection between her taking of FMLA leave and her termination. She attempts to do so by showing that she was fired approximately 5 months after she took FMLA leave, which, as already noted, is not particularly persuasive. Still, and as also noted, the burden of establishing a *prima facie* case is not onerous and there is more leeway in considering temporal proximity to show a causal connection than there is to establish pretext.

Accepting that Plaintiff has established a *prima facie* case of age discrimination and FMLA retaliation, those claims again fail at the second and third stages of the McDonnell-Douglas framework. Defendant's legitimate, non-discriminatory reasons for its termination decision has equal applicability to these claims, and Plaintiff has not shown them to be pretexual for the same reasons that she did not show pretext with regard to her ADA claim.

Additionally, Plaintiff's suggestion that her employment was terminated because of age-based animus is under cut by the fact that ten of the sixteen other Telephonic Nurses under Ms.

16

Koyuncu's supervision were aged 59 or over, three of whom still work for Defendant, and four of whom (including a 74 year old) were successful performers who voluntarily resigned. And her suggestion that she was terminated because she took FMLA leave is undercut by the fact that Ms. Smith (who Plaintiff identified as a comparator in her discovery responses) took FMLA leave, was placed on a PIP, and continued to be employed after she successfully completed the plan.

## IV. Conclusion

On the basis of the foregoing, the Court will enter an Order granting summary judgment on all of Plaintiff's claims.[7]

*(signature)*
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[7] Because of this disposition, the Court need not consider the parties' argument under the after-acquired evidence doctrine.